UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FREDRICK LEE CHRISTOPHE,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>T. NUNN,<br><br>　　　　　　　Defendant. | CASE NO. C19-519-BJR-MLP<br><br>REPORT AND RECOMMENDATION |

## I.　　INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff, who is currently confined at the Washington Corrections Center in Shelton, Washington, is proceeding with this action *pro se* and *in forma pauperis*. Plaintiff alleges in this action that City of Auburn Police Officer Timothy Nunn and his K-9 partner used excessive force in effectuating Plaintiff's arrest in January 2019. (Compl. (Dkt. # 7) at 5-6.) Plaintiff identified a number of Defendants in his amended complaint, the operative pleading in this action, but all Defendants except Defendant Nunn were previously dismissed from this action. (*See id*. at 2; Dkt. # 14.) Plaintiff seeks damages in excess of $1 million and declaratory relief. (*Id*. at 4.)

REPORT AND RECOMMENDATION
PAGE - 1

Defendant Nunn has filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Def.'s Mot. Summ. J. (Dkt. # 34).) Plaintiff has filed a response opposing Defendant's motion for summary judgment (Pltf's Resp. (dkt. # 43))[1], and Defendant has filed a reply brief in support of his motion (Def.'s Reply (dkt. # 44))[2]. The Court, having reviewed Defendant's motion, all related briefing, and the balance of the record, concludes that Defendant's motion for summary judgment should be granted, and Plaintiff's amended complaint and this action should be dismissed with prejudice.

## II.   BACKGROUND

On January 15, 2019, in the early hours of the morning, Plaintiff got into a fight with his roommate, Eric Crockett. (Compl. (Dkt. # 7) at 5; Mix Decl. (Dkt. # 35), Pltf's Dep. (Ex. 1) at 20.) According to Plaintiff, Mr. Crockett had earlier stolen from him about $800 as well as other personal property, including his cell phone. (Pltf's Dep. at 20-21.) When Plaintiff discovered it was Mr. Crockett who had stolen his property, he decided he had to confront him. (*See id*. at 21, 41.) Plaintiff, who was at work at the time he made this decision, returned to the residence he shared with Mr. Crockett. (*Id*. at 41-42.) Plaintiff woke Mr. Crockett up and demanded an apology and the return of his stolen property. (*Id*. at 42.) A fight ensued during which the two men wrestled on the floor and Plaintiff bit Mr. Crockett. (*See id*. at 9, 11.) Mr. Crockett called 911 and the Kent Police Department responded.

---

[1] Plaintiff submitted a letter to the Court on August 31, 2020 which was construed as a second response to Defendant's pending summary judgment motion, but which appears to primarily contain an explanation of why Plaintiff has not yet been able to submit evidence to the Court in support of his claim. (Dkt. # 48.) Because the time for submitting evidence has passed, and because Plaintiff has already submitted a response to Defendant's motion, Plaintiff's second response is STRICKEN.

[2] Defendant requested in his reply brief that Plaintiff's response be stricken as untimely. The Court addressed this request in a prior order, advising that Plaintiff's late-filed response would be accepted for filing. (*See* Dkt. # 47.)

REPORT AND RECOMMENDATION
PAGE - 2

When Kent Police Officer Jennifer Prusa arrived at the scene, she interviewed Mr. Crockett who advised that he had been bitten and had sustained injuries to his arms. (Prusa Decl. (Dkt. # 40) at ¶¶ 3, 4.) Mr. Crockett described Plaintiff to Officer Prusa and advised that Plaintiff was sitting on top of a black Escalade. (*Id*. at ¶ 4.) Officer Prusa thereafter observed Plaintiff sitting on the roof of a black Escalade without his shirt on. (*Id*. at ¶ 5.) Kent Police Officer Rosser, who was on the scene with Officer Prusa, gave Plaintiff commands to stop, which he disregarded. (*Id*. at ¶¶ 5, 6.) Plaintiff then jumped down from the Escalade and began walking away from officers. (*Id*. at ¶ 7; *see also* Pltf's Dep. at 22-23.) Officer Prusa followed Plaintiff in her patrol car and saw him begin to run down the street. (Prusa Decl. at ¶ 7.) Several other officers arrived in the area as Plaintiff ran down an alley and attempted to hide behind a local business. (*Id*.; Pltf's Dep. at 23.) Officers continued to pursue Plaintiff on foot and continued to give him verbal commands to stop, but Plaintiff disregarded the commands. (Goforth Decl. (Dkt. # 38) at ¶ 5; Nunn Decl. (Dkt. # 39) at ¶ 8.)

As the other officers continued to pursue Plaintiff, Officer Prusa returned to the original scene to speak with Mr. Crockett. (Prusa Decl. at ¶ 8.) Mr. Crockett showed Officer Prusa three fresh, bleeding bite marks on his arms and told her that Plaintiff had caused the injuries. (*Id*.) At that point, Officer Prusa radioed the other officers in the area to advise them that there was probable cause to arrest Plaintiff for assault in the fourth degree. (*See id*.; Goforth Decl. at ¶ 7.) Kent Police Officer Sean Goforth then pursued Plaintiff on foot as he sprinted away and jumped over two fences. (Goforth Decl. at ¶¶ 8-10.)

Defendant Nunn, who arrived on the scene early in the pursuit and had been observing Plaintiff and the officers following him, saw Plaintiff walk by his vehicle after Officer Prusa radioed the probable cause alert. (Nunn Decl. at ¶¶ 7-11.) The Kent police officers were no

REPORT AND RECOMMENDATION
PAGE - 3

longer behind Plaintiff at that point. (*Id*. at ¶ 11.) Defendant Nunn exited his vehicle and told Plaintiff to stop or he would send his K-9 after him. (*Id*. at ¶ 12.) Plaintiff turned around to look at Defendant Nunn but did not comply with the directive to stop. (*Id*.) Officer Goforth, who caught up to Plaintiff as Defendant Nunn was contacting him, heard Defendant Nunn give the verbal K-9 warnings and saw that Plaintiff did not comply. (Goforth Decl. at ¶¶ 10-11.) Defendant Nunn gave another K-9 warning and opened the door to release the dog from the vehicle. (Nunn Decl. at ¶ 13.) Plaintiff then stopped walking but did not turn around. (*Id*. at ¶ 14.) The K-9 ran towards Plaintiff but never made contact because Plaintiff had already stopped. (*Id*., ¶ 15; Goforth Decl. at ¶ 12.)

Defendant Nunn moved towards Plaintiff and instructed him to get on his knees so he could be handcuffed, but Plaintiff instead went all the way to the ground and laid on his stomach. (Nunn Decl. ¶ 16.) Plaintiff was handcuffed and taken into custody by the Kent police officers while Defendant Nunn walked the K-9 back to his patrol car. (*Id*. at ¶ 18; Goforth Decl. at ¶¶ 13-14.)

Plaintiff's account of his apprehension, as set forth in his amended complaint, varies somewhat from the officers' accounts.[3] Plaintiff acknowledges that he ran from officers as they approached him and that he was ultimately apprehended. (Compl. at 5.) Plaintiff asserts, however, that Defendant Nunn arrived on the scene with his K-9 partner as Plaintiff was lying on the ground, face down and in handcuffs, after being apprehended by the Kent police officers. (*Id*.) Plaintiff claims that as Defendant Nunn approached him with his K-9, Defendant Nunn suddenly bent down and whispered into the ear of his K-9 partner "Let's show his black ass what

---

[3] Plaintiff testified during his deposition that he had help drafting his complaint by an individual named "Hollywood," whom he apparently met while incarcerated. (*See* Pltf's Depo. at 74.) According to Plaintiff, he told Hollywood exactly what happened, and he "wrote all this stuff up," but that Hollywood "helped [him] with some of it." (*Id*.)

REPORT AND RECOMMENDATION
PAGE - 4

we do to runners." (*Id*.) According to Plaintiff, Defendant Nunn then gave his K-9 partner a command which caused the dog to leap forward towards Plaintiff and bite him on the leg. (*Id*.)

The Kent police officers on the scene all deny seeing the K-9 bite plaintiff or hearing Defendant Nunn say "Let's show his black ass what we do to runners," and Defendant Nunn denies that either of these things occurred. (Bratlien Decl. (Dkt. #37) at ¶ 11; Goforth Decl. at ¶ 15-16; Nunn Decl. at ¶ 21; Prusa Decl. at ¶ 10.) Plaintiff was asked at the scene if the dog had bitten him, and he denied that it had. (Goforth Decl. at ¶ 17; Nunn Decl. at ¶ 19.) Plaintiff also refused any medical aid. (Nunn Decl. at ¶ 19.)

Once Plaintiff was apprehended, he provided Kent Police Officer Erin Bratlien a false name and a false birthdate. (*See* Bratlien Decl. at ¶ 7.) Plaintiff subsequently provided a correct name and was transported and booked into the Kent City Jail. (*Id*. at ¶ 12.) Plaintiff was charged with assault in the fourth degree and making a false statement to a police officer. (Mix Decl., Ex. 2.) Plaintiff subsequently pled guilty to the assault charge. (Mix Decl., Ex. 3.)

After Plaintiff filed this action, he was deposed by Defendant Nunn's counsel. (*See* Mix Decl., Ex. 1.) During his deposition, Plaintiff was asked about the statement attributed to Defendant Nunn in his amended complaint; *i.e.*, "Let's show his black ass what we do to runners." (Pltf's Dep. at 73-75.) Plaintiff admitted that he was not certain Defendant Nunn ever actually made that statement. (*See id*.) Plaintiff's version of how and where he was bitten, as alleged in the amended complaint, is also inconsistent with Plaintiff's deposition testimony.

Plaintiff asserts in his pleading that the K-9 bit him while he was lying face down on the ground with his hands cuffed behind his back. (Compl. at 5.) At his deposition, Plaintiff displayed a scar on his left upper thigh, towards the front of the leg, which was allegedly caused by the dog bite. (*See* Mix Decl., Ex. 4.) Plaintiff testified, however, that Officer Nunn and the K-

REPORT AND RECOMMENDATION
PAGE - 5

9 approached him from his right side. (*See* Pltf's Dep. at 78-79, 81.) Plaintiff acknowledged that if he was in the position he described the K-9 could not have bitten him where Plaintiff indicated he had been bitten. (*See id*. at 81-83.)

Plaintiff went on to speculate that he had been bitten when the officers rolled him over, though he conceded he did not remember. (*See id*.) Plaintiff was asked if the alleged bite could have happened while he was turned over as he was getting up, but Plaintiff unequivocally denied that, making clear that he was not upright when he was bitten and that "[the K-9] hit me, and I'm horizontal." (*Id*. at 83.) Plaintiff also testified at his deposition that the bite resulted in holes in the jeans he was wearing and that the jeans had some blood on them. (*Id*. at 65-66.) A photograph taken during Plaintiff's arrest, but after he was allegedly bitten, shows no holes in his jeans nor any blood in the area where the bite was alleged to have occurred. (Mix Decl., Ex. 5.)

### III.    DISCUSSION

#### A.    Applicable Standards

##### *1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

REPORT AND RECOMMENDATION
PAGE - 6

persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003). The Supreme Court has explained that when opposing parties tell two different stories, one of which is blatantly

REPORT AND RECOMMENDATION
PAGE - 7

contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

    2.    *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

**B.    Analysis**

Plaintiff asserts in his amended complaint that Defendant Nunn used excessive force against him, in violation of his constitutional rights, when Defendant Nunn caused his K-9 partner to lunge at Plaintiff and bite him while Plaintiff was lying on the ground handcuffed and in the custody of City of Kent police. (*See* Compl. at 5-6.) Claims that law enforcement officers used excessive force in the course of an arrest must be analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Supreme Court explained in *Graham* that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citation omitted).

To determine whether the force allegedly used was objectively reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. In other words, the Court weighs the type and amount of force inflicted against the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, and any other relevant factors. *See id*.; *Jackson v. City of Bremerton*, 268 F.3d 646, 651-52 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Defendant argues in his summary judgment motion that Plaintiff's excessive force claim should be dismissed because the overwhelming evidence in this case suggests that the K-9 never bit Plaintiff. (Def.'s Mot. Summ. J. at 9-11.) Defendant cites to the following evidence in the record to support his argument: (1) four officers present at the scene of Plaintiff's arrest confirmed that the K-9 did not bite Plaintiff; (2) Plaintiff, in his deposition testimony, agreed that his version of how he was bitten does not make sense; (3) contrary to his deposition testimony, Plaintiff's jeans were neither ripped nor bloody at the scene after the alleged bite; and (4) Plaintiff never told anyone at the scene that he had been bitten. (*Id*. at 11.)

Plaintiff, in his response to Defendant's motion, denies the suggestion that he and the individual who helped him draft his complaint falsified the excessive force claim leveled against Defendant Nunn. (Pltf's Resp. at 1.) Plaintiff goes on to claim that the Kent police officers on the scene falsified their reports by not mentioning that the K-9 had been released on him, and he asserts that a careful review of the reports would reveal contradictions and even an admission that the K-9 had been released. (*Id*. at 2.) According to Plaintiff, one report acknowledged that

the K-9 had "nosed" him and noted that the dog had run past him. (*Id.*) Plaintiff suggests this is false because such dogs are trained to attack and not to smell and run past pursuits.[4] (*Id.*)

Plaintiff also appears to suggest in his response that possible discovery in this case includes a video of his apprehension and that Defendant withheld the video until it could be altered to delete the portion showing the dog bite. (*Id.* at 3.) Plaintiff asks this court to review the video and note apparent anomalies in the tape at the point where the dog is approaching Plaintiff. (*Id.*) Plaintiff also asks the Court to subpoena his medical records from the Kent City Jail where he received medical attention after being booked. (*Id.*) Plaintiff maintains that he has been attempting to obtain a copy of his medical file from the Kent City Jail but has "been given the run around." (*Id.*) Plaintiff asserts that there are additional medical records validating the dog bite at St. Joseph Hospital in Tacoma where he claims he went for treatment after he was released from jail. (*Id.* at 4.)

Plaintiff argues that the photograph of the purported bite submitted in support of Defendant's summary judgment motion clearly shows the scar left by the bite, and he maintains that it was indeed possible for him to be bitten in the location shown in the photograph because the bite was on the side of his leg, which would have been exposed, and not the front part of his leg as suggested by Defendant. (*Id.*) Plaintiff also argues that the picture of him at the scene which was submitted by Defendant in support of his summary judgment motion does not show blood because the pants are jeans and it would require a light pair of pants and forensic testing to be indisputable. (*Id.*) Plaintiff concludes his response with a plea for this Court to subpoena not

---

[4] Officer Nunn explains in his declaration in support of his motion for summary judgment that the K-9 is trained to apprehend fleeing suspects when directed, but in this case, Plaintiff had stopped walking. (Decl. of Nunn at ¶¶ 14-15.) Officer Nunn states that the K-9 appeared unsure who he was being directed toward when he did not see anyone actively fleeing. (*Id.* at ¶ 15.)

REPORT AND RECOMMENDATION
PAGE - 10

only his medical records, but also the individual officers who were at the scene as he believes at least one of them will come forward and substantiate his claim. (*Id*. at 4-5.)

Plaintiff's assertions that there is available evidence which would support his claims are insufficient to defeat summary judgment. Plaintiff must actually present evidence establishing that there is a genuine issue of material fact for trial. Plaintiff has had ample time during the pendency of this action to collect and present evidence to support his claims, yet he has failed to do so. Plaintiff has not produced the police reports which he claims were falsified, he has not produced the video he claims was altered, and he has not produced any medical evidence demonstrating that he was actually bitten by Defendant Nunn's K-9 partner in the early morning hours of January 15, 2019. It is not the Court's role or responsibility to procure the evidence necessary to support Plaintiff's claims, it is Plaintiff's burden to do so, and to do so in a timely manner. Plaintiff has not met this burden.

The evidence that is currently in the record before this Court contradicts Plaintiff's version of events as set forth in his amended complaint. The evidence shows that the K-9, after being released, ran past Plaintiff while Plaintiff was standing upright, and that the K-9 never contacted him. The evidence also demonstrates that by the time Plaintiff was in handcuffs, the K-9 was actually back in Defendant Nunn's patrol car and therefore could not have bitten Plaintiff while he was restrained. The four officers on the scene confirm that the dog did not bite Plaintiff, and Plaintiff himself denied he had been bitten at the scene and refused medical attention.

The photograph of the purported bite arguably shows the scar as being closer to the front of Plaintiff's left thigh than to the side, which would admittedly have been more exposed. However, even if one were to view the photo as depicting a scar more on the side of Plaintiff's thigh than on the front, Plaintiff still fails to explain how he could have been bitten there given

his insistence at his deposition that Defendant Nunn and his K-9 partner approached him from the opposite side. As Defendant correctly observes, Plaintiff himself agreed during his deposition that his version of how he got bit does not make sense in light of his position on the ground and the fact that the dog was on the opposite side of Plaintiff from where the purported bite occurred. Finally, the fact that the photo of Plaintiff taken at the scene does not show any blood on Plaintiff's jeans, even if attributable to unfavorable lighting conditions, does not explain why the jeans do not appear to be ripped as Plaintiff testified to at his deposition.

In sum, Plaintiff's claim that Defendant Nunn used excessive force against him is simply not plausible in light of the evidence in the record which demonstrates that Plaintiff was never actually bitten by Defendant Nunn's K-9 partner. Defendant Nunn is therefore entitled to judgment as a matter of law.

## CONCLUSION

Based on the foregoing, this Court recommends that Defendant's motion for summary judgment be granted and that Plaintiff's amended complaint and this action be dismissed with prejudice. A proposed Order accompanies this Report and Recommendation.

//

//

//

//

//

//

//

//

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **December 4, 2020**.

DATED this 9th day of November, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge